1-250-596-WC, Carl Budig, Appellant by Nicole Russo v. Illinois Workers' Compensation Commission et al., Juana Perez-Appley by Brenton Schmitz. Counsel Russo, you may proceed. Good morning. May it please the Court, Counsel, my name is Nicole Russo and I represent the appellant in this matter, Carl Budig. The main issue on appeal is whether the Illinois Workers' Compensation Commission's finding that the appellee's cervical condition is causally related to her April 22, 2021, injury was against the manifest weight of the evidence. Appellant Carl Budig's position is that it was for several reasons. To begin, I acknowledge the significant manifest weight burden of proof at issue here but suggest that the manifest weight burden has been met to establish that only a work-related injury to the left arm was sustained on April 22. Facts in this case are largely in agreement between the parties. On April 22, 2021, Juana Perez was employed as a line packer for Carl Budig where she would rotate between various positions on a lunch meat packaging line. The specific line position that the appellant was working on at the time of her injury was called a slicing position. It required her to load 18 to 20 pound logs of lunch meat into a slicing machine. She admittedly sustained a work-related injury to her left arm on April 22, 2021, while working in that slicing position. Now the dispute comes in here as to whether the incident also caused injury to her cervical spine, ultimately necessitating the cervical fusion surgery that's in dispute. Appellant Carl Budig argues today that the finding of causal connection regarding the cervical spine and the subsequent award of cervical surgery is against the manifest weight of the evidence. The basis for the argument is that the manifest weight of evidence in the record fails to document that the April 22, 2021 incident resulted in cervical injury that's supported by multiple injury reports, as well as the initial treatment records. The first compelling pieces of evidence to support the lack of cervical injury are the multiple injury reports that were prepared. Now these were prepared within one to two days of the injury date. At trial, Ms. Perez testified that on the injury date, she had pain from her elbow to the back of her back and into her neck. However, this mention of pain and injury radiating into the neck that she testified to at trial is absent from the injury report that she herself prepared on the day after the injury. It's Russo, the pain diagram that you reference. I looked at it and she did mark the area where her neck and shoulder meet. And so aren't we simply talking about nuance here as opposed to compelling evidence that she wasn't complaining about her neck? Well, I think when you look at the cumulative evidence, we're not talking about a nuance. We do have three separate reports. Again, one that she prepared herself in her own handwriting, two spots on that report she mentions, only the left arm. She also goes into detail about the mechanism, doesn't mention any mechanism to her neck. The treating records from the initial dates of service, the typewritten notes clearly reference only injury to the left arm. The work restrictions reference the left arm only as well. And that's again, cumulative with the corroborating reports from the supervisor and the safety manager as well. In addition to the injury report she prepared, while that was fresh in her mind, again, as noted the mechanism itself that she described only talks about a pull in her arm with pain from her elbow to her shoulder. This lack of cervical injury, again, as I stated, is corroborated by the testimony and the reports prepared by David Streeter and the supervisor report. Again, these as well also document injury to the left arm. Was she, may I ask, is she bilingual or is she Spanish speaking only? She did use a translator at the time of testimony. The report was completed in Spanish. She had a Spanish, she was able to complete it in Spanish and it was translated with a translator. And were any of her providers, do we know, were any of like the providers, the doctors that she saw, were they Spanish speaking as well or? I know the first one, Dr. Cordova was Spanish speaking. I can't say for sure about the subsequent providers. Okay, thank you. The next compelling evidence to support the position that the finding of cervical causal connection is against the manifest weight, we've talked about a bit here, was the treating medical records. As discussed, she was seen by Dr. Cordova on April 26th, which was four days after. Again, she gives a history regarding the accident and she identifies a mechanism involving the left arm only, x-rays of the left arm were taken. There was no cervical x-rays prescribed. She has a typewritten note from Dr. Cordova where he diagnoses an acute condition to the left shoulder and he places a restriction on that left shoulder only. Then we have subsequent notes from May 28th, June 16th, June 21st, all which again diagnose left shoulder, left arm injuries, restrictions on the left arm only, aggravation of the left In addition to what I've already talked about, we have the reports and testimony from Dr. Gleason, where she again gives a history. She describes symptoms and injury to the left arm and shoulder only. Dr. Gleason does an objective cervical exam, which he determines was completely normal. He performed, based on his testimony and reports, he performed cervical range of motion. He described that as pain-free and completely normal. He performed Sperling's test, which was also negative and normal. Now we're not suggesting that the appellee should be able to discern her own diagnosis, but in this instance, she's the only person who can identify and document what body parts she injured and describe how that injury occurred. In this case, as noted, she documents in her own writing in the injury reports only to the left arm. The next significant issue that I would like to address also regarding the manifest weight issue is that the manifest weight of the evidence clearly supports reversal of the medical bills, most specifically the bills that were awarded from South Suburban Physical Therapy. I just want to point out this issue was significant enough to warrant a nearly six-page dissenting opinion from Commissioner Dorries in the commission decision. It's appellant's position that the manifest weight of the evidence clearly supports reversal of the award of over $24,000 in charges for physical therapy that was done between November 2021 and July 2022. In the record, you will note that there were 20 separate utilization review reports that were admitted into evidence. Most of these addressed the reasonableness of nearly 100 sessions of physical therapy that were performed by that provider. Of those 100 sessions, only 16 of them were certified by utilization review. It's our position that these UR reports created a rebuttable presumption that shifted the burden to the appellee to show by a preponderance of evidence that the treatment in question was reasonably required, which she felt to do. To the contrary, the manifest weight of the evidence supports that only 16 of the 96 sessions were reasonable. There were extensive medical records from the eight months of therapy that showed no significant subjective or objective improvement beyond the first four to six weeks of therapy. In addition, prior to even beginning the therapy at South Suburban, she had undergone over six months of chiropractic care first with Dr. Cordova. She had, at that point, 14 months of conservative care, which didn't result in any significant improvement. It's clear that the manifest weight of the evidence shows that the prescribed eight months of therapy at South Suburban, on top of the six months of conservative care, was excessive and medically unreasonable. But Ms. Russo, you know, how much of this argument is really asking us to Monday morning quarterback? I mean, doctors prefer conservative approaches before they recommend more radical approaches. Presumably, the docs here weren't having her go through therapy just for the sake of going through therapy. They presumably thought that it would have helped her condition, granted there were 100 therapy sessions before they decided to pursue a more aggressive approach. Sure, I'm sorry for interrupting you. My question really is, I mean, you know, is this, why is this something that we shouldn't defer to the commission? Well, it's something that the commission failed to adequately consider, in my opinion. As noted, conservative treatment is warranted, but it was excessive. And by presenting the utilization review reports, the burden shifted back to the appellee and she didn't meet that burden. She didn't present any testimony or even any supporting records or narrative opinions or anything from either the therapist that performed the ineffective treatment or the doctors prescribing them. There was nothing from Dr. Mendel, Dr. Kautsky, or Dr. Horner to refute the utilization review reports and substantiate why this was allowed to prolong for an additional 80 sessions beyond the ODG guidelines. So the plain language of 8.7 requires that, you know, the appellant, you know, rebut that and provide some documentation and some medical evidence to refute that, and she didn't do so in this case. So let me ask you this question. What you're saying is, is that there are guidelines out there, and when treatment exceeds what those guidelines are, the burden of production or the burden of proof falls on the, in this case, the appellee. Correct. When there's a admissible utilization report that's non-certifying treatment based on the guidelines, which was the case in this instance, then yes, it becomes her burden to substantiate why that shouldn't be followed, and she didn't do so in this case. Thank you. Based on the above, the manifest weight supports reversal of the bill from self-suburban physical therapy in the amount of $24,755.54. Regarding the remaining issues, appellant rests on its brief. Any questions from the court? None. Okay. Thank you. Thank you, counsel. You have time to reply. Counsel Schmitz, you may respond. Thank you, Justice Holdredge. Good morning, and may it please the court. Brenton Schmitz on behalf of the appellee, Ms. Juana Perez. I just want to start very briefly by addressing a question that was asked by Justice Barbaras regarding the petitioner's language ability. Petitioner testified in Spanish through an interpreter. The record did not reveal any specific interrogation of her English language ability. Counsel indicated that Dr. Cordova spoke to the claimant in Spanish. Dr. Gleason, the defense expert, as well as Dr. Kautsky and Dr. Sampath, the treaters, all indicated in their records that they interacted with the claimant through the use of Spanish-English interpreters. So, that question being answered, I want to start by talking about the standard of review. An appellate argument should always begin with the standard of review because it's important for us to confirm at the outset, you know, what is the question being asked here? You know, questions of fact decided by the commission are reviewed on the manifest way to the evidence standard. Questions of law reviewed on the de novo standard. Counsel did not raise any questions of law in her brief or in her argument. So, what we're looking at here is the manifest way to the evidence standard. No rational trier of fact could have come to the conclusion the commission did. The opposite conclusion must be clearly apparent. The task before the court today is not to reweigh the evidence. The task is to determine if the commission weighed the evidence. And if so, as long as any rational trier of fact could have gotten to the conclusion the commission did, the reviewing court must affirm. I have not heard. So, counsel, tell us about the ruling the commission made and what it relied upon and how do you support with your argument the commission's findings? So, the commission in this case discussed in the decision of the arbitrator, which was affirmed two to one, well, two and a half to one, but we'll get to that by the commission, indicates the commission reviewed the medical records. The commission reviewed the testimony of Dr. Gleason. The commission reviewed the testimony of Dr. Sampat. The commission spent three and a half single-spaced pages of its decision weighing all of that evidence and ultimately determining the opinions of Dr. Sampat outweighed the opinions of Dr. Gleason and found in favor of the claimant. The commission weighed the evidence. They did their job. They did what they were supposed to do. There's been no discussion of any evidence that the commission did not consider or did not weigh. There has been discussion of evidence that the appellant believes the commission placed the wrong weight on. But again, that's not the role of this court. Appellant's argument begins essentially with the proposition that the claimant did not discuss neck pain or a neck injury very early on. As pointed out by Justice Taylor, we have the pain diagram with Dr. Cordova that's shaded up to the area where the shoulder meets the neck. We have cervical spine x-rays taken on April 26, 2021. We have a note of reduced cervical range of motion on the same date. We have a diagnosis of cervical disc displacement and radiculopathy on the same date, all from Dr. Cordova. And that's, I believe, less than a week after the occurrence. So we're seeing very early on already discussions of the neck, discussions of the cervical spine. And as the appellant points out next, then Dr. Gleason comes in. Dr. Gleason, in his first examination, in his first report, finds that the mechanism of injury that Petitioner described could be a competent cause of a cervical spine injury. He gave that up in his first report. You know, Dr. Gleason then, in his testimony in his later reports, changes his opinions and says, well, you know, maybe, you know, then the cervical spine wouldn't be related, at least in part because he did not note a positive Sperling's test in his evaluations. And we pointed out in our brief 14 different times that the treating physicians noted a positive Sperling's sign. So when Dr. Gleason, you know, changes his opinion and comes back and says, you know what, the cervical spine isn't related, and he's doubling back on what he originally pointed out. You know, Dr. Sampat relied on the history given to him by the claimant. He relied on the records that he was given. He determined what the cervical spine diagnosis was. He determined that it was causally related. The commission weighed those conflicting opinions. The commission found Dr. Sampat's testimony to be more credible. That's the job of the commission to do. You know, I think the appellant here sort of, you know, gives up the ghost in its brief on page 17 when they state that the commission failed to give the proper weight to the credible opinions of Dr. Gleason. That's not the standard here. The standard is, did the commission consider those opinions? What weight they placed on those opinions is the job for the commission to do. And they did that job in this case. Coming back to Dr. Gleason, there's one other thing I wanted to point out. In his testimony, Dr. Gleason discounted the positive results of the EMG study, the nerve study, and that's a study that he himself recommended. In his first report, in the first IME report in October of 2021, Dr. Gleason said, yeah, she should have an EMG test, a nerve test. That test came back positive. Later on, Dr. Gleason discounts that and says, you know, I don't buy it. I don't see it as being causally related. You know, one of the things that I really love doing in an appellate brief is distinguishing the cases cited by my opponent. It's a challenge for a lawyer to take a similar case and to try to explain, you know, how the fact pattern we're dealing with and the law we're dealing with differs from that case. You know, as the court is aware, I didn't really get to do that here. You know, the respondent or the appellant did not cite to, you know, any opinions from this Court of the Illinois Supreme Court as far as their causation argument that they could analogize to. You know, I was able to find one that I could analogize to, the Kishwaukee Community Hospital case. Now, I don't think that's a true analogous case because I disagree with the proposition that there is a delay in reporting of next symptoms here. But in the Kishwaukee Community Hospital case, you know, there was a report of a bilateral wrist injury. Eight months go by, and then for the first time, the right thumb comes up. The commission weighed that evidence, found in favor of the claimant, found that the thumb was related, and, you know, this court affirmed and found that that determination was not against the manifest weight of the evidence. So we do have analogous precedential cases that tell us that even if there is a significant delay in reporting of a particular body part, that's not necessarily fatal to the case. It doesn't necessarily rise to a manifest weight argument. And again, I don't agree that there is a delay in reporting of cervical symptoms here. But, you know, to the extent that counsel does, the Kishwaukee Hospital case would be my response. The last thing that I really want to talk about is, you know, the Utilization Review on Physical Therapy that was done. Justice Holdredge, you know, asked about this and then talked about, you know, the guidelines that are in place, the ODG guidelines that Utilization Review uses. The commission considered those reports. We know the commission considered those reports. The arbitrator talks about them in the decision. And as noted by counsel, we have a fairly lengthy dissent from one of the commissioners on that specific issue. So we know the commission considered it. We know it was discussed and talked about. The commission ultimately determined that petitioner had met her burden, that that treatment was reasonable and necessary. You know, once again, there's no citation in the appellant's brief to, you know, any sort of case law for the proposition of a burden shift. We have citations to the statute which do suggest a burden shift. But I think as Justice Holdredge pointed out, you know, as long as the claimant is putting forth appropriate evidence and the commission considers that evidence, the commission can do that. You know, the commission is to consider admissible Utilization Review in the same manner as any other evidence. And that's exactly what the commission did here. You know, was there evidence on both sides of this case with respect to causation and respect to the reasonableness and necessity of past treatment? Absolutely there was. If there wasn't evidence on both sides of this case, there wouldn't have been a trial. Or perhaps there would have been a trial along with a petition for penalties and attorney's fees. But we didn't have that here. You know, there's always evidence on both sides of the case. You know, it's the job of the commission to weigh that evidence. The commission weighed that evidence. You know, the appellant disagrees with the weight the commission gave to specific pieces of evidence. And the appellant is allowed to disagree. But that does not rise to the level of the manifest weight of the evidence. I submit that the commission's determinations on causation and past medical were not against the manifest weight of the evidence. The opposite conclusion is not clearly apparent. And this court should affirm. Thank you. Any questions from court? None. Okay. Counsel, you may reply. I just have one brief issue that I'd like to go back to on rebuttal. In his response, counsel says that the claimant did meet her burden of rebutting the utilization review reports. And my response to that is that where he didn't cite anything. He didn't, again, he didn't cite any specific record that substantiated or refuted that. He didn't cite any testimony from any of the treaters. And it simply doesn't exist. We have treatment prescribed in excess by some providers. We have the guidelines which tell us the extent of that. We have reports non-certifying the bulk of that treatment. And we don't have anyone, any medical doctor rebutting that issue. Further questions from the bench? Could I ask, I mean, do you contend that they needed specific medical testimony saying, you know, to rebut the presumption or. Not necessarily. And just to, you know, close the, to drop the other foot. Could the commission, in viewing the totality of the evidence, make the determination that the presumption, the rebuttable presumption had been defeated? If you review back to the UR reports themselves, there is an appeal process in place for the prescribing providers. I don't recall each one individually because there were 20 of them. But I believe the bulk of them, the providers themselves, didn't even respond to the appeals to substantiate their prescription, their prescribed treatment. Is that necessary to rebut the presumption? It is a requirement. It is a part of the statutory language. Yes. True. But let's assume they don't appeal then. Is that a fact with which or from which the commission or this court should take meaning? Well, I think it supports the position that they didn't shift the burden back. Further questions? Okay. Thank you, counsel, both for your arguments on this matter this morning. It will be taken under advisement. Written disposition shall issue. And at this time, the clerk of our court will escort you from our remote courtroom will proceed to the next case. Thank you, your honors. Thanks, counsel. Thank you.